Filed 3/2/23  P. v. Record CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>IDRIS MALIK RECORD,<br><br>    Defendant and Appellant. | H048100<br>(Santa Clara County<br>Super. Ct. No. B1794389) |

R.D. was attacked in her apartment by an intruder who forcibly subdued her, dragged her into her bedroom, and sexually assaulted her, eventually fleeing.  A jury convicted Idris Malik Record, R.D.'s neighbor, of burglary, misdemeanor assault, forcible sexual penetration, and kidnapping.  On appeal, Record argues that (1) there was insufficient evidence to support the kidnapping conviction, (2) the sexual penetration conviction was fatally inconsistent with his acquittal on the charge of assault with intent to commit the same sex offense, (3) the trial court erred by excluding evidence that he was not the source of epithelial cell DNA that was found on R.D.'s underwear, and (4) the trial court violated his constitutional right to be personally present at critical stages of the proceedings when it discussed limitations on his testimony.  In a supplemental brief, he also argues that Assembly Bill No. 518 (2021-2022 Reg. Sess.) retroactively applies to his case and requires reversal of the judgment.

We affirm the judgment.

I.     BACKGROUND

**A.     *The Information***

On May 31, 2018, the Santa Clara County District Attorney filed an information charging Record with assault with the intent to commit a specified sex crime during the commission of a first degree burglary (Pen. Code, § 220, subd. (b); count 1),[1] sexual penetration by force (§ 289, subd. (a)(1); count 2), kidnapping to commit a sexual offense (§ 209, subd. (b)(1); count 3), and criminal threats (§ 422; count 4).  As to counts 1 and 2, it was alleged that Record personally inflicted great bodily injury (§§ 12022.8, 1203, subd. (e)(3)).  And as to count 2, it was alleged that Record committed the offense during the commission of a burglary with the intent to commit a sexual offense within the meaning of the "One Strike" law (§ 667.61, subds. (a) & (d)).

**B.     *The Prosecution's Case***

**1.     *The Offense***

R.D., a middle school teacher, lived alone in an apartment located in a two-story complex in Sunnyvale.  Her approximately 650-square foot unit was on the top floor, accessible by an exterior staircase.  Her front door opened onto the living room, which was adjacent to the kitchen.  Her bedroom, to the rear of the unit, had a window overlooking the two-story drop to the ground.  The distance from R.D.'s living room couch to her bedroom was approximately five to eight feet.  R.D. knew the couple who lived in an adjacent two-story unit that shared a wall with her bedroom, but she was unfamiliar with the rest of the complex's tenants.

On October 10, 2017, R.D. fell asleep on her living room couch while watching television.  Her living room blinds were closed, though movement and light within the

---

[1] Unspecified statutory references are to the Penal Code.

2

apartment could be detected from outside at certain angles. She was wearing a shirt, underwear, and a FitBit.

According to R.D.'s FitBit, it was 11:49 p.m. when she fell asleep and 5:37 a.m. the next morning when she awoke. On waking, she noticed that everything was dark; the television and lights were off, but she could see "a figure rushing" toward her. The intruder sat on her midsection and pressed something—possibly a pillow and a sweater—over her face. The pressure was great enough to make R.D. feel like her throat was closed and she could not breathe. She turned her head to the right and tried to scream, "Motherfucker, stop. Asshole, stop." Her assailant replied, "Shut up. Shut up or I'll kill you."

R.D. reached up with her left arm and tried to scratch her assailant. She felt what seemed like a Bluetooth device around his neck and tried to click its buttons. R.D. felt herself being lifted from behind, and she could no longer touch the ground. The man had his arm around her throat and was moving her away from the couch. R.D. tried to claw behind her and at the man's arm to get back onto the ground.

R.D. could tell that her assailant was moving her toward her bedroom, which made her "[m]ore afraid." To keep him from putting her face-down on the bed, she started pushing against the bed with her arms and legs. She urinated on herself during the struggle and told the man that she had urinated, but he did not let go of her. R.D. could feel her shin and leg scrape the metal edge of the bed frame. Her attacker's arm still around her throat, R.D. asked to go clean up.

R.D. then felt the man's hand go under the bottom of her shirt and into her underwear. Crouched over the edge of her bed, with her attacker right behind her, R.D. felt the man's finger go "inside of [her]." In a surge of energy, R.D. pushed off the bed, ending up on the floor. The man straddled her chest, and she felt more material over her face, smothering her and forcing her face to one side. R.D. twisted her lower body and

3

tried to buck the man off her. As she tried to call for help, her attacker punched her in the ribs, and she heard him tell her to "shut up."

Still trying to shout, R.D. lost consciousness. When she came to, she was still on the floor with the man still straddling her, but her body had been rotated so her head was now in the direction of the rear window. She had no knowledge of how long she had been out. R.D. screamed for help. At R.D.'s scream, the man ran out of the apartment.

### 2.     *The Police Investigation*

#### a.     *At the Scene*

When officers arrived about 6:00 a.m., R.D. was crying, her voice seemed raspy and hoarse, and her face looked swollen. R.D. told officers that her assailant was a "large man" wearing a Bluetooth device, a dark hooded sweatshirt, and jeans with a belt or something "really tight." She thought that the man might have been Hispanic based on his accent, but she had never been able to make out his face. R.D. reported that she had scratched her assailant.

In a canvass of R.D.'s neighbors, police spoke with a tenant in apartment 4—the unit sharing a wall with R.D.'s bedroom—who reported hearing someone in a hurry to leave and a car starting at around 5:30 or 5:45 a.m.

Around 6:26 a.m., an officer saw Record walking along the driver's side of a car toward the stairwell in the parking garage. Record had a cut or scratch on his face. He also had a shirt in his hand. Record told the officer that he had just left for his job as an electrician but returned on realizing he had forgotten his work uniform. While being questioned, Record became increasingly nervous and appeared eager to leave. Record initially said the cut on his face was from shaving. But Record had a five o'clock shadow and did not look like he had shaved that morning. Record then attributed the cut to him "scrubbing" his face really hard in the shower that morning. When asked earlier for a

4

detailed timeline of his activities since the night before, however, Record omitted the fact that he had taken a shower.

In Record's car, officers found a gray sweatshirt and a pair of jeans with a Bluetooth headset and charger in the pocket. Police never found a hoodie, but the gray sweatshirt had a large black collar.

R.D. was unable to identify Record and had never seen him around the apartment complex before.

### b. *Record's Post-Arrest Statements*

Interviewed at the police station post-arrest, Record said that a call or text from his wife woke him shortly before 6:00 a.m. and that he left for work shortly after waking. From the parking garage, he saw that R.D.'s door was open, so he went up to her apartment to tell her about her door.

Record said "hello" or knocked before he went inside. It was dark inside the apartment, and Record saw R.D. sleeping on the couch. When he approached her, R.D. woke up and became hysterical. Record tried to restrain her and told her to shut up. Record said that he picked her up from behind with his arm around her throat and dragged her into her bedroom.

Record initially said that he pushed her into her bedroom, locked the door, and left. He later said that R.D. continued to fight and struggle with him, but that at one point R.D. stopped struggling and calmed down, to the point that Record became concerned. Once satisfied that R.D. was still breathing, however, Record started to leave. He then decided to go back to her, but she "woke up" and started to yell again. R.D. held onto him to prevent him from leaving.

Record said that he told R.D. to be quiet, fled the apartment, went down the street, and got into his car. He then drove around to a stoplight. He decided to go back to the

5

apartment so he could tell R.D. that everything was just a misunderstanding. Record denied that he touched R.D. in a sexual way.

Record was adamant that in R.D.'s apartment he had been wearing the same clothes—white shirt, blue sweatpants, and flip-flops—that he had been wearing when officers first stopped him; he also told officers that he had been wearing the blue uniform shirt that he had in his hand when first contacted by the officers.

### 3. *SART Examination and DNA Evidence*

Nurse Linda Richards, an expert in the collection and preservation of sexual assault evidence, conducted R.D.'s Sexual Assault Response Team (SART) examination. Richards noted a red spot with a darker red spot in the center on R.D.'s perihymenal tissue. Richards then applied toluidine blue gel and reexamined R.D. with a colposcope. During this examination, Richards saw an abrasion from the bottom of the vaginal opening, near the posterior fourchette, on the labia minora and the perihymenal tissue. She also saw an abrasion in the anal area. Richards opined that these injuries were consistent with penetration.

R.D. indicated in the examination that she had not had intercourse within five days. R.D. had a Nuvaring birth control device that Richards did not take note of during her initial exam. At trial, R.D. estimated that she had reinserted the Nuvaring device a day before the attack. The Nuvaring itself is a "very smooth rubber or latex" item; its insertion—using a thumb and forefinger to compress the ring then place it around the cervix—would, in Richards's view, involve "a different friction area" than the location of R.D.'s injuries and was therefore unlikely to have caused them.

Results from forensic testing of R.D.'s vaginal and cervical swabs were presumptively negative for the enzyme found in seminal fluid. Samples swabbed from R.D.'s right nails and lips tested presumptively positive for blood.

6

A DNA expert testified that analysis of R.D.'s vaginal swab was not performed, because a vagina's constant sloughing of cells makes the likelihood of detecting contact DNA in a digital penetration case "very low." Examining R.D.'s left finger swab for "male specific only DNA," the DNA expert found a mixture of at least five profiles, of which the major Y-STR male profile matched Record's profile at 16 locations. The rest of R.D.'s swabs came back as a mixture of DNA, but little conclusion could be drawn from the analysis.

The DNA expert also examined a sweatshirt found inside R.D.'s apartment that officers thought may have been used to smother R.D. One stain on the sweatshirt tested positive for blood, but little could be concluded from the DNA analysis aside from a finding that R.D. was a possible source of major DNA on the shirt collar, which had a mixture of DNA from two individuals. The front waistband and interior front of R.D.'s underwear had a mixture of DNA from at least two individuals—a major contributor matching R.D. and at least one male minor contributor, but the low levels of minor DNA precluded further conclusions. Urine, however, could wash away DNA.

## C.    *The Defense Case*

### 1.    *Record's Testimony*

Record and his sister, A.R., moved into apartment number 2 of R.D.'s complex in April 2017. Record had moved to Sunnyvale from San Diego because he thought his earning potential in Northern California would be higher. His wife and two daughters did not move with him because Record wanted to finish his vocational program first and get settled. Record was proficient in electronics and mechanics and had previously been in the United States Navy. After his move, he started working as the staff electrician for a recycling company.

Record would typically wake up around 5:00 to 5:30 a.m., take a shower, and leave for work by 6:30 a.m.

7

The morning of October 11, 2017, Record walked to his car in the parking garage and saw that R.D.'s door was open. When it continued to remain open as Record tidied the interior of his car, he became concerned and went up to R.D.'s apartment, leaving his keys and wallet in his car. Record said hello one or two times when he got to the front door but heard no response. The lights were off, but he could see a hand on the couch inside the apartment.

Thinking something might be wrong, Record went to the front of the couch and leaned over. The person on the couch, R.D., moved. Record tapped on the couch, and R.D. moved again and had a look of fear on her face. Record then made "a stupid decision" to tap again on the couch, and R.D. woke up, opening her eyes. She then "stretched her hands towards [Record's] face like a cat." Record tried to move his hands out to indicate that he was not going to hurt her, but R.D. started to hit him.

Because R.D. was hitting him, Record tried to restrain her and told her to stop. Record put his hands on her but never grabbed R.D. by the neck or tried to choke her. Record just wanted to push R.D. into her bedroom so he could get some space to find one of his sandals, which he had lost during his altercation with R.D., and then leave. R.D. tried to grab Record's genitals, so he pushed her and walked out of the bedroom.

Record looked for his sandal in the living room. When he went back to the bedroom, he saw R.D. on the floor holding something. She said she was going to kill him and started walking towards him. Record left to avoid further confrontation.

After leaving R.D.'s apartment, Record stood on the stairs for about a minute to see if R.D. would come out. Feeling bad about what had happened, he wanted to explain himself. He went downstairs and paced, but R.D. still did not come out. Record then left in his car, but upset, he decided while at a stoplight to return to the apartment complex.

On his return, Record saw that there were officers everywhere. Suspecting the officers were there because of what had happened with R.D., he felt nervous and

8

frustrated with himself. He initially wanted to go talk to his sister but decided to take responsibility for his actions, so he walked back toward his car, where an officer approached him.

Record, however, did not initially tell the truth about what happened, because he was embarrassed and was feeling "really stupid." After he was arrested and taken to the police station, he realized that the officers mistakenly thought that he had done something "sexual" to R.D. because they took a penile swab.

Record did not enter the apartment with the intent to rape R.D., and the last time he had seen her in the complex was several months before the incident.

### 2.      *Record's Sister*

Record's sister, A.R., was a nurse at a nearby hospital. The siblings were raised by their grandparents in Panama "on a very strict Christian background." Record was living with A.R. and her two sons while his wife and his two daughters were in Mexico. Record typically woke up around 5:00 a.m. and left for work between 5:30 and 6:00 a.m.

The night before R.D. was attacked, A.R. had the flu, which kept her awake coughing. She got up in the middle of the night at around 4:00 or 4:30 a.m. to take medication. At that time, she heard Record snoring in the other room. After taking medication, A.R. stayed up reading. Around 5:30 a.m. or 6:00 a.m., A.R. heard Record get ready in the morning and leave. Although A.R. initially told officers she heard Record leave around 6:20 or 6:25 a.m., she was in "severe shock and trauma" at the time.

### 3.      *Forensic Evidence*

Nurse practitioner Nicole Yadon testified as an expert in forensic SART nurse examinations, findings, and opinions. Yadon disagreed with Richard's finding that there was a red spot on the perihymenal tissue based off the photographs from R.D.'s SART exam. Yadon also disagreed with the finding that there was an abrasion near the posterior fourchette area.

9

According to Yadon, a red spot on the perihymenal area could be the result of various factors ranging from poor hygiene, wearing a menstrual pad, or general friction from walking or moving or wearing tight clothing. Yadon opined that insertion of R.D.'s Nuvaring could produce a red spot and an abrasion in the vaginal area.

## D. *The Prosecution's Rebuttal*

### 1. *SART Program Coordinator*

Kim Walker was the program coordinator for the Sexual Assault Forensic Exam Team at Santa Clara Valley Medical Center and testified as an expert in the collection and preservation of sexual assault evidence and in determining whether a patient's injuries are consistent with her history of sexual assault. Walker reviewed photographs and injury findings from R.D.'s SART exam. Based on her review of the photographs, Walker confirmed the injuries Richards had noted.

Walker could not tell whether the abrasion injury to the labia minora would be consistent with the digital penetration R.D. had described but noted that R.D.'s reported loss of consciousness prevented R.D. from giving a comprehensive account of what happened. Walker also noted that due to the breadth of the abrasion near the posterior fourchette, she would expect that the object that abraded the area would be "a little bit bigger and a little bit rougher than a finger." Walker theorized that the abrasion could have been caused by two fingers. Walker opined that the abrasion would not be consistent with R.D.'s voluntary insertion of a Nuvaring or tampon: "there would not be this level of abrasion, because there would be pain associated with it, and I don't imagine someone would be using an object that would create pain like that." The red spot, however, could be consistent with many things—including blunt force trauma or hygiene, or a personal physical characteristic.

10

## 2. *Nuvaring Expert*

Dr. Eileen Schneider, a family medicine doctor, saw R.D. as her patient. Schneider testified as an expert in the Nuvaring and types of injuries or lack thereof that the device can cause. According to Schneider, it is "highly, highly, highly unlikely" that a Nuvaring could cause an abrasion at the posterior fourchette. Schneider opined that an abrasion is caused by a scraping motion by something that is kind of rough, but the Nuvaring is "very, very smooth." It is possible to not even touch the posterior fourchette when inserting a Nuvaring. She had never seen any of her patients who have been prescribed a Nuvaring have an abrasion at the posterior fourchette area.

## E. *The Verdict and Sentencing*

On April 16, 2019, the jury returned a verdict. As to count 1, the jury found Record not guilty of assault with the intent to commit sexual penetration by force while committing first degree burglary (count 1; §220, subd. (b)) and not guilty of the lesser included offense of assault with intent to commit sexual penetration (§ 220, subd. (a)) but guilty of the lesser included offenses of first degree burglary (§§ 450, 460) and simple assault (§ 240). As to count 2, the jury found Record guilty of sexual penetration by force (§ 289, subd. (a)(1); count 2) and found true the allegations that he inflicted great bodily injury (§ 289, subd. (a)(1)) and that he committed the charged offense while committing a first degree burglary (§ 667.61, subds. (a) & (d)). As to count 3, the jury found Record not guilty of kidnapping to commit sexual penetration (§ 209, subd. (b)(1); count 3) but guilty of the lesser included offense of simple kidnapping (§ 207, subd. (a)). And finally, the jury found Record not guilty of criminal threats (§ 422; count 4).

On March 13, 2020, the trial court sentenced Record to 25 years to life for sexual penetration by force in the commission of a first degree burglary (count 2) under the One Strike law (§ 667.61, subds. (a) & (d)) and five years for the allegation that he had inflicted great bodily injury. The trial court also imposed a concurrent six-month

11

sentence for misdemeanor assault and stayed the sentences for kidnapping (five years) and burglary (four years) under section 654.

## II. DISCUSSION

### A. *Sufficiency of the Evidence*

Record argues there is insufficient evidence to support his conviction for simple kidnapping (§ 207, subd. (a)) because R.D. was moved a distance of only five to eight feet, from the living room couch to her bedroom, and the movement actually *increased* his likelihood of detection as her bedroom wall was shared with a neighbor's kitchen. In reviewing a claim of sufficiency of the evidence, we must determine " ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*People v. Young* (2005) 34 Cal.4th 1149, 1175.) "We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

### 1. *Legal Principles*

Under section 207, subdivision (a), "[e]very person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." Thus, "[t]he prosecution must prove that the defendant unlawfully moved the victim by the use of physical force or fear, without the person's consent, and the movement was for a substantial distance (the asportation element)." (*People v. Williams* (2017) 7 Cal.App.5th 644, 670 (*Williams*).)

12

"For simple (rather than aggravated) kidnapping, the jury is to ' "consider the totality of the circumstances," ' not simply distance, in deciding whether the movement was substantial." ' " (*Williams*, *supra*, 7 Cal.App.5th at pp. 670.)  In *People v. Martinez* (1999) 20 Cal.4th 225 (*Martinez*), overruled on a different point as stated in *People v. Fontenot* (2019) 8 Cal.5th 57, 70, our high court described some of the contextual factors that may be considered when determining whether a movement is substantial.  For example, "in a case where the evidence permitted, the jury might properly consider not only the actual distance the victim is moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes." (*Martinez*, *supra*, at p. 237, fn. omitted.)

Additionally, if there is an associated crime—a criminal act that the defendant intends to commit where the defendant also moves the victim by force or fear against his or her will—the jury should be instructed to consider whether the distance the victim was moved was incidental to the associated crime.  (*People v. Bell* (2009) 179 Cal.App.4th 428, 439; *People v. Perkins* (2016) 5 Cal.App.5th 454, 466 (*Perkins*).)

The *Martinez* court acknowledged that "[t]he asportation requirement for simple kidnapping has historically been less clear" than that of aggravated kidnapping. (*Martinez*, *supra*, 20 Cal.4th 225, 233.)  Unlike a conviction for aggravated kidnapping, asportation for simple kidnapping does not require an increase in harm so long as the victim was moved a "substantial distance." (*Williams*, *supra*, 7 Cal.App.5th at p. 671.)  And in contrast to aggravated kidnapping, in a case involving simple kidnapping, a jury may convict a defendant *without* finding an increase in harm, "or any other contextual factors"—"the jury need only find that the victim was moved a distance that was

13

'substantial in character.' " (*Martinez*, *supra*, 20 Cal.4th at p. 237.) In other words, no single contextual factor controls.

*Martinez* did not purport to set forth a minimum threshold for distance, but our high court did state that "contextual factors, whether singly or in combination, will not suffice to establish asportation if the movement is only a very short distance." (*Martinez*, *supra*, 20 Cal.4th at p. 237.) *Martinez*, however, did not quantify what constitutes a "very short" distance. And following *Martinez*, multiple courts have upheld kidnapping convictions where a victim was moved only a minimal distance, especially where the movement changes the victim's environment—for example, going from the inside of a house to the outside, or going from a place of public view to the interior of an apartment. (See *People v. Nieto* (2021) 62 Cal.App.5th 188, 200 [sufficient evidence of asportation where minor victim was lured from inside of house to outside even though no actual distance was proven]; *People v. Arias* (2011) 193 Cal.App.4th 1428, 1435 [sufficient evidence of asportation when defendant moved victim approximately 15 feet from outside of apartment to the apartment's interior].)

### 2. *Analysis*

Record argues that his movement of R.D. was not of a "substantial distance" as is required for a conviction of simple kidnapping. He points out that the distance from the living room couch to the bedroom was short, approximately five to eight feet. Moreover, R.D. testified that the door from the bedroom to the living room remained open during the entirety of the assault. And due to the configuration of R.D.'s apartment complex, R.D.'s closest neighbors' kitchen shared a wall with her bedroom. Thus, Record argues that his movement of R.D. from the living room to the bedroom arguably *increased* his risk of detection because he was, effectively, moving R.D. to an area where she was more likely to be heard. Moreover, he insists that given Record's size, it was unlikely that the

14

physically smaller R.D. would have been able to escape from whatever room he moved her to within the confines of the apartment.

Record's argument, in essence, asks us to reweigh the evidence and override the jury's apparent reliance on contrary evidence in the record. We agree that the distance between the living room couch and the bedroom was apparently short, but absent a minimum required distance, we are unable to disregard contextual factors present in the trial record. Viewed in the light most favorable to the judgment, the evidence supports the jury's conclusion that the movement was not merely incidental to the underlying sexual penetration offense. In *People v. Shadden* (2001) 93 Cal.App.4th 164, for example, the Second District found sufficient evidence to support even aggravated kidnapping in the defendant's movement of the victim from the front of a store to a back room—a distance of nine feet—in part because the movement was not merely incidental to the rape: " 'a rape . . . does not necessarily require movement to complete the crime.' [Citation.] Where a defendant drags a victim to another place, and then attempts a rape, the jury may reasonably infer that the movement was neither part of nor necessary to the rape." (*Id.* at p. 169.) Record's movement of R.D. from the living room to her bedroom prior to the sexual penetration is not materially distinguishable.

Critically, the jury had ample evidence from which to determine that Record's movement of R.D. was itself violent, thereby increasing the risk of physical harm to her beyond either nonphysical coercion or the force inherent in forcible sexual penetration. (See *People v. Griffin* (2004) 33 Cal.4th 1015, 1028 [reversing court of appeal for requiring force " 'substantially different from or substantially greater' " than force needed to accomplish intercourse with victim against her will]; see also *People v. McCann* (2019) 41 Cal.App.5th 149, 157 [applying *Griffin* to forcible sexual penetration].) That R.D. was physically outmatched by Record in terms of height and weight is not, as Record argues, a factor that would support our finding the movement here insubstantial

15

as a matter of law: Record himself confirmed that R.D was tenacious in her physical resistance to his presence in the apartment and that he therefore moved her into the bedroom "to get some space." The jury could have reasonably inferred that moving R.D. into another room deeper in the apartment decreased her likelihood of escape, if only by limiting her avenues for escape to the breadth of the bedroom doorway.

The jury could have also reasonably found that the movement into the bedroom increased the risk of psychological harm to R.D. (See, e.g., *People v. Leavel* (2012) 203 Cal.App.4th 823, 834 [increased risk of harm to victim can include psychological harm]; see also CALCRIM No. 1215 [risk of harm also includes psychological harm].) Contrary to Record's representation in his reply brief, R.D. testified that she became "[m]ore afraid" as Record carried her into the bedroom and that she became intent on resisting Record's efforts to put her on the bed. Drawing all inferences in favor of the judgment, as we must, we construe R.D.'s testimony about her increased fear and redoubled resistance as reflecting an intensified desperation as the movement to her bedroom presaged a more intimate violation to come, in a more intimate space.

Record analogizes his case to *Perkins*, *supra*, 5 Cal.App.5th 454, which we find factually distinguishable.[2] In *Perkins*, the defendant sodomized the 11-year-old victim in the apartment's bathroom then ordered her to move to the bedroom—a distance of 10 to 30 feet—where he resumed the sexual assault. (*Id.* at pp. 459, 470.) The Third District concluded there was insufficient evidence to support both the kidnapping enhancements and aggravated kidnapping enhancements. (*Id.* at p. 471.) There was no evidence that

---

[2] Record also relies on *In re Crumpton* (1973) 9 Cal.3d 463 (*Crumpton*) and *People v. Williams* (1970) 2 Cal.3d 894; both cases are distinguishable, however, in that the high court in each analyzed the sufficiency of the evidence for *aggravated* kidnapping, which noted above *requires* an increase in a risk of harm. (*Crumpton*, *supra*, at p. 465 [defendant was convicted of aggravated kidnapping under section 209]; *People v. Williams*, *supra*, at p. 899 [same].)

16

the manner of movement increased the risk of harm or decreased the likelihood of detection.[3] (*Id.* at p. 470.)  There was also no evidence that the movement of the victim increased the danger in the victim's foreseeable escape as the defendant's "significant size" rendered it unlikely that the 11-year-old victim could have fled from either location; nor was there evidence that moving the victim enhanced the defendant's opportunity to commit additional crimes as the defendant could have committed whatever crime he wanted in both rooms.  (*Ibid.*)  In other words, there were *no* contextual factors in *Perkins* that supported a finding that the movement was substantial in character, unlike here.

Thus, considering the totality of the circumstances, we conclude that a reasonable jury could find that Record moved R.D. a substantial distance.  (*Williams*, *supra*, 7 Cal.App.5th at p. 670.  In reaching our conclusion, we are mindful that our review is for substantial evidence, and we must affirm even if a reasonable trier of fact could have reached a different result.  (See *People v. Jason K.* (2010) 188 Cal.App.4th 1545, 1553.)

**B.**     ***Inconsistent Verdicts***

Next, Record argues that the jury's verdict is fatally inconsistent because the jury acquitted him of assault with the intent to commit sexual penetration during a burglary (§ 220, subd. (b)) but found him guilty of sexual penetration by force (§§ 289, subd. (a)(1)) and found true the allegations that Record had inflicted great bodily injury (§ 12022.8) and had committed the charged offense while committing a first degree burglary (§ 667.61, subds. (a) & (d)).

Preliminarily, we observe that the two verdicts are not necessarily inconsistent. The jury acquitted Record of violating section 220, subdivision (b), which states that "[a]ny person who, in the commission of the burglary of the first degree . . . assaults

---

[3] Although R.D.'s closest neighbors shared a wall with her bedroom, the jury had little basis to infer that Record was aware of this feature.

17

another with the intent to commit rape, sodomy, oral copulation, or any violation of Section 264.1, 288, or 289 shall be punished . . . ." Yet the jury found Record guilty of sexual penetration by force under section 289, subdivision (a)(1), which states that "[a]ny person who commits an act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on [the person] shall be punished by imprisonment in the state prison . . . ." The jury also found true the enhancement that the offense was committed "during the commission of a burglary of the first degree" under the One Strike law. (§ 667.61, subd. (d)(4).)

The two crimes do not have identical elements, nor is one necessarily included within the other, whether as a matter of law or on these facts. A violation of section 220, subdivision (b) requires an intent to commit a sexual penetration but not necessarily the act of sexual penetration, whereas forcible sexual penetration committed during a burglary does *not* require an antecedent assault. The jury could have concluded that Record did not initially assault R.D. with the intent to commit sexual penetration and only *later* formed the requisite intent to commit a sexual penetration after he had already assaulted R.D. in the living room and had dragged her into the bedroom.

Moreover, we conclude that even if we assume that the verdicts are inconsistent, reversal is not required. Section 954 provides in pertinent part: "An accusatory pleading may charge . . . different statements of the same offense . . . under separate counts . . . . An acquittal of one or more counts shall not be deemed an acquittal of any other count." Thus, for example, " 'if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both.' " (*People v. Avila* (2006) 38 Cal.4th 491, 600 (*Avila*).)

18

Accordingly, as a general rule, inconsistent verdicts are permitted if the guilty verdicts are supported by substantial evidence. (*People v. Lewis* (2001) 25 Cal.4th 610, 655-656 (*Lewis*); *People v. Bell* (2020) 48 Cal.App.5th 1, 9-10.) "Although ' "error," in the sense that the jury has not followed the court's instructions, most certainly has occurred' in such situations, 'it is unclear whose ox has been gored.' [Citation.] It is possible that the jury arrived at the inconsistent conclusion through 'mistake, compromise, or lenity.' [Citation.] Thus, if a defendant is given the benefit of an acquittal on the count on which he was acquitted, 'it is neither irrational nor illogical' to require him to accept the burden of conviction on the count on which the jury convicted." (*Avila*, *supra*, 38 Cal.4th at p. 600.)

There is a limited exception precluding inconsistent verdicts in conspiracy cases, which was established by our high court in *In re Johnston* (1935) 3 Cal.2d 32 (*Johnston*). In *Johnston*, the defendants were convicted of conspiracy to violate certain provisions of the Corporate Securities Act but were acquitted of the actual overt acts. (*Johnston*, *supra*, 3 Cal.2d at pp. 33-34.) *Johnston* noted that the principal question before the court was: "[D]o the acquittals on the thirteen counts charging the defendants with the specific crimes of violating the Corporate Securities Act amount to special findings that the defendants did not commit the overt acts alleged in the count charging conspiracy?" (*Id.* at pp. 34-35.) *Johnston* held that if the answer was yes, "it must follow by reason of the specific controlling the general, that the court was without jurisdiction to pronounce a judgment of conviction on that count." (*Id.* at p. 35)

Record, however, relies on *People v. Hamilton* (1978) 80 Cal.App.3d 124 (*Hamilton*), overruled on a different point as stated in *People v. Flood* (1998) 18 Cal.4th 470, and argues that a broader exception to section 954's general rule prohibits inconsistent verdicts " 'where all of the essential elements of which the crime of which the defendant was acquitted are identical to some or all of the essential elements of the

19

crime of which he was convicted, and proof of the crime of which the defendant was acquitted is necessary to sustain a conviction of the crime of which the defendant was found guilty.' " (*Id.* at p. 130.) Record argues that *Hamilton* noted that the exception to the general rule concerning inconsistent verdicts "occurs, *for example*, where a conspiracy count alleges as the only overt act a crime set forth specifically in another count, and the defendant is found not guilty of the specific crime, but is found guilty of conspiracy; such an inconsistency invalidates the conspiracy conviction." (*Id.* at p. 130, italics added.) In other words, Record reads *Hamilton* as applying the *Johnston* exception to nonconspiracy cases.

Yet this broad language in *Hamilton* has since been questioned by other courts. (See *People v. Pahl* (1991) 226 Cal.App.3d 1651 (*Pahl*).) The language in *Hamilton* upon which Record relies is derived from *Johnston*, but *Johnston* itself limited its application to conspiracy cases. (*Pahl*, *supra*, at p. 1658; *Johnston*, *supra*, 3 Cal.2d at p. 36, italics added ["we cannot construe [section 954] to mean that an indictment or information charging *conspiracy* is sufficient" without an allegation of an overt act or when a defendant has been acquitted of all overt acts].) *Hamilton* accurately describes the conspiracy exception, "but it generalizes as if the exception applies to all crimes. Because it does not, [the language in *Hamilton*] is inaccurate and misleading." (*Pahl*, *supra*, at p. 1660.) Moreover, the language that Record relies on in *Hamilton* is dicta; *Hamilton* did not apply *Johnston*'s limited judicial exception to the case at bench—the *Hamilton* court ultimately declined to apply any exception as two charged offenses were not identical. (*Hamilton*, *supra*, 80 Cal.App.3d at pp. 130-131.)

Finally, Record claims that there are several post-*Johnston* cases that have applied the exception described in *Johnston* to non-conspiracy cases. Yet none of the cases that Record cites—affirmances all— support his position, as those courts ultimately concluded that the offenses at issue were either not identical or were not necessary to

20

sustain a conviction for the other offense. (*People v. Hickman* (1939) 31 Cal.App.2d 4, 11-12 [defendant's offenses of grand theft and attempt to commit grand theft were not identical]; *People v. Federico* (1981) 127 Cal.App.3d 20, 31-33 [allegation that the defendant was armed with a firearm was not necessary to support conviction for murder]; *People v. Amick* (1942) 20 Cal.2d 247, 254 [verdicts acquitting the defendant of manslaughter but finding him guilty of negligent homicide was permissible as the crimes were not identical under section 954].)

Moreover, accepting Record's position would nullify section 954 and run counter to recent California Supreme Court decisions that have upheld inconsistent verdicts. For example, in *Avila*, our high court concluded that the jury's acquittal of the defendant on the charge of rape did not entitle him to have stricken the jury's true finding on the rape-murder special circumstance. (*Avila*, *supra*, 38 Cal.4th 491, 600.) As noted in *Avila*, "a 'criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts . . . . [No] further safeguards against jury irrationality are necessary.' " (*Avila*, *supra*, 38 Cal.4th 491, 601, quoting *United States v. Powell* (1984) 469 U.S. 57, 67.)

Here, Record does not challenge the sufficiency of the evidence that he committed forcible sexual penetration during a burglary. And upon our review, we are satisfied that there is sufficient evidence—particularly given R.D.'s extensive testimony—to uphold his conviction on this count. (See *Lewis*, *supra*, 25 Cal.4th at pp. 655-656.; *People v. Duncan* (2008) 160 Cal.App.4th 1014, 1018 [testimony of one witness can constitute substantial evidence].) For these reasons, we conclude that no inconsistency in Record's verdicts warrants reversal of his convictions.

## C.    *Exclusion of Epithelial Skin Cell Evidence*

Record argues that the trial court prejudicially erred by excluding evidence that he was excluded as a contributor of epithelial skin cells found in a cutting from the crotch of R.D.'s underwear.  Record argues that the exclusion of the evidence violated his constitutional right to present a defense.  Although we question the relevance on this record of epithelial skin cells of an unidentified male under Evidence Code section 782, we assume without deciding that the trial court erred by excluding testimony that Record was excluded as a contributor of any DNA found in the one cutting.  We conclude, however, that any error was harmless.

### 1.    *Background*

Before trial, Record filed a motion under Evidence Code section 782 seeking to introduce evidence of R.D.'s prior sexual conduct—that Craig Lee, the DNA expert who analyzed cuttings from the underwear that R.D. wore during the attack, had found sperm from an unknown male on the underwear.  Defense counsel argued that the evidence was relevant because the SART exam findings of the red spot could also be consistent with consensual digital penetration or some other sexual act.

At the hearing on the motion, Lee testified that a five millimeter by five millimeter cutting from the interior crotch of R.D.'s underwear was analyzed in the laboratory.  Because the analyst who selected the cutting did not testify, no evidence was presented as to how the location of the cutting from the interior crotch panel was selected.  Present on the cutting were more than 10 sperm cells that did not match Record's DNA.  Also found were a smaller number of epithelial cells from at least two individuals including R.D. and an unidentified male.  Record was excluded as a contributor of the epithelial cells.

According to Lee, the sperm cells could have survived even if R.D. had washed the underwear prior to testing.  "[T]here's no actual timeframe" for how long sperm cells may last, and they can last "years even, if the underwear is kept in certain conditions."

22

Epithelial cells do not last as long as sperm cells, but epithelial cells can still survive a washing. When asked if epithelial cells would last one or two weeks, assuming the underwear was not laundered, Lee answered that the cells could last, depending on the conditions the underwear was kept in.

The following day, defense counsel argued that he wanted to admit "all the scientific findings" made by Lee. Defense counsel argued that the presence of sperm on R.D.'s underwear raised doubts as to the credibility of R.D.'s denial of recent sexual intercourse and could support an alternative explanation for findings made by Richards about the injuries she saw during the SART exam. Defense counsel argued that excluding the evidence would violate Record's Sixth Amendment right to confront his accuser and his due process right to present a defense.

After considering the parties' arguments, the trial court excluded "evidence of the . . . sperm [and] epithelial cells," and further excluded questioning R.D. about her sexual history. The following day, the trial court reaffirmed its earlier ruling and further reasoned under Evidence Code section 352 "that [the evidence] was unrelated to the charged crimes; it would be prone to cause confusion; and it will lead the jury to consider irrelevant evidence; and thus, lead to speculation and will add significant time to introduce the lab results." The trial court also denied under Evidence Code section 352 the defense request to generally present a "sanitized version" of the evidence that Record had been excluded as a source of "unlabeled deposits" on R.D.'s underwear because presenting the evidence in generic from "would immediately circle back to what that evidence is, epithelial cells and the sperm cells, whose is it, and why is it there."

## 2. *Legal Principles and Standard of Review*

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) Under California's rape shield law, however, "[e]vidence of the sexual conduct of a complaining witness is admissible in a prosecution for a sex-related

23

offense only under very strict conditions," and it is not admissible for certain purposes, such as to prove the victim's consent. (*People v. Fontana* (2010) 49 Cal.4th 351, 362 (*Fontana*); Evid. Code, § 1103, subd. (c).) Such evidence may be admissible "when offered to attack the credibility of the complaining witness and when presented in accordance with the procedures under [Evidence Code] section 782." (*Fontana*, *supra*, at p. 362.)

Evidence that is otherwise relevant and admissible may nonetheless be excluded under Evidence Code section 352 if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) creates substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

On appeal, we review the trial court's decision on the admissibility of evidence under Evidence Code sections 352 and 782 for an abuse of discretion. (*People v. Gonzalez* (2021) 12 Cal.5th 367, 408; *People v. Bautista* (2008) 163 Cal.App.4th 762, 782.)

### 3.    *Analysis*

On appeal, Record no longer argues that the trial court erred by excluding evidence of the sperm cells, that the presence of male DNA was relevant to the credibility of R.D.'s account of her prior sexual history, or that the presence of DNA from another male offers an alternative explanation for R.D.'s injuries. Rather, he argues that the trial court erred by excluding evidence of (1) male epithelial cell DNA present on the cutting from the crotch of R.D.'s underwear and (2) Record's exclusion as the contributor of that DNA, as the evidence was exculpatory, critical to his defense, and not prohibited by Evidence Code section 782.[4] As a threshold matter, to the extent Record still appears to

---

[4] The Attorney General argues that Record has forfeited this argument as it was not raised below to the trial court. (See Evid. Code, § 354, subd. (a).) We disagree—

24

argue that the presence of another man's DNA in R.D.'s underwear was relevant and admissible to show that Record never touched her underwear, he is mistaken. Traces of R.D.'s consensual sexual contact at a remote point in time[5] had no tendency in reason to prove or disprove the allegations against Record. What nonetheless remained relevant, however, was that Record's DNA was absent from the cutting, irrespective of whether anyone else's DNA was also present. Assuming for argument's sake that the trial court erred by excluding testimony that R.D. was excluded as a contributor of any DNA found in this underwear cutting, we nevertheless conclude that any error was harmless.

Record argues that the error deprived him of his constitutional right to present a defense, requiring application of the harmless-beyond-a-reasonable-doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). "[C]ompletely excluding evidence of an accused's defense" infringes an accused's due process right to present a defense, but "excluding defense evidence on a minor or subsidiary point" does not. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103 (*Fudge*).) "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' " (*Id.* at pp. 1102-1103.) In such cases, prejudice is evaluated by the standard of review articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)—that is, reversal is required if it is reasonably probable that the

---

although defense counsel initially sought admission of the evidence under Evidence Code section 782, he later attempted to clarify whether he would be prohibited from "even generically" eliciting that the laboratory had examined cells from the crotch of R.D.'s underwear and had determined that Record was excluded as a contributor of the DNA found. Defense counsel's statements adequately apprised the trial court of "[t]he substance, purpose, and relevance of the excluded evidence." (Evid. Code, § 354, subd. (a).)

[5] R.D. testified that she last had a sexual encounter had been a few months before the assault.

defendant would have received a more favorable verdict in the absence of error. (*Fudge*, *supra*, at p. 1103.)

In this case, the trial court's refusal to admit the fact that Record was excluded as a contributor of DNA in the cutting did not completely exclude evidence of Record's defense. Other evidence supported Record's assertion that he did not digitally penetrate R.D.—as his counsel argued to the jury, the prosecution was unable to match Record to any DNA found on R.D.'s underwear, and Record was able to present the testimony of his expert, Yadon, who disputed Richards' findings and opinions as to the red spot and the abrasion in the SART examination. Accordingly, we do not consider the failure to admit sanitized testimony to the effect that Record was positively excluded as a contributor of DNA on a particular cutting to have completely precluded Record's defense. (See *Fudge*, *supra*, 7 Cal.4th at p. 1103.) Thus, we examine prejudice under the standard of state of law error under *Watson*, *supra*, 46 Cal.2d at page 836.

And under *Watson*, we conclude that it is not reasonably probable that in the absence of error, Record would have received a more favorable verdict. The probative value of Record's exclusion from the epithelial DNA evidence was limited by the relatively miniscule portion sampled. The record is silent as to how this particular cutting from the crotch was selected for testing, or as to the likelihood that the fleeting digital penetration R.D. described would have resulted in the presence of the perpetrator's epithelial cells in this particular sector of underwear that at the time of the offense would have been freshly wet with urine, which Lee testified could wash away DNA. Accordingly, on this record, we are unable to conclude that Record's exclusion from the cutting would have been particularly probative.

In contrast, there was ample evidence from which the jury, if properly presented with the absence of Record's DNA on this cutting, would nonetheless be able to find Record's guilt. There was no dispute that it was Record who entered R.D.'s apartment,

26

grabbed her and forced her into her bedroom in a struggle that resulted in her temporary loss of consciousness. At issue was whether Record's intention was sexual and whether he penetrated R.D.'s vagina with his finger. Although Yadon contested the SART findings of injury, Walker concurred in Richards' findings of an abrasion and a red spot, consistent with R.D.'s unequivocal testimony.[6] Both Walker and Schneider disputed Yadon's Nuvaring theory for an abrasion Yadon opined did not exist. And although R.D. was unaware of what happened when she was unconscious, she was unequivocal in her testimony regarding her resistance and the sexual penetration before that loss of consciousness. Record, equally unequivocal in his trial testimony, had made a number of prior inconsistent statements to law enforcement, including an admittedly false denial of any contact with R.D., from which the jury was entitled to infer his consciousness of guilt. We are therefore unable to conclude that Record has demonstrated a reasonable probability of a more favorable result, absent the assumed error.

Record nonetheless asserts that the prosecutor amplified the prejudicial effect of the exclusion of the evidence by arguing in closing, "The lack of DNA. They're saying the lack of DNA on her underwear . . . creates reasonable doubt. We know that she had male DNA on her shirt, on her underwear, other places on her body, but it was too low of a level for them to actually compare to the defendant." But the prosecutor also added, "[H]is DNA isn't on her underwear . . . Don't be thrown off by that."

It is not apparent how this argument would have prejudiced Record. The prosecutor correctly summarized the evidence that was admitted in the first part of the quoted argument: there *was* male DNA found on R.D.'s shirt and on the waistband of her

---

[6] Although Walker opined that due to the breadth of the abrasion near the posterior fourchette, she could expect that the object that abraded the area would be "a little bit bigger and a little bit rougher than a finger." Walker, however, opined that the abrasion could have been caused by two fingers.

underwear, but the low level of DNA precluded any meaningful conclusions. The second part of the prosecutor's statement—that Record's DNA was not on R.D.'s underwear—was in fact consistent with the evidence Record asserts was erroneously excluded: in other words, the prosecutor did not impermissibly argue a fact that she knew to be untrue when she asserted that Record's DNA was not found on the underwear. (See, e.g., *People v. Daggett* (1990) 225 Cal.App.3d 751, 757-758 [prosecutor may not ask "jurors to draw an inference that they might not have drawn if they had heard . . . evidence the judge had excluded"].) Taken in context, the prosecutor's argument was that the absence of identifiable DNA profiles on R.D.'s clothing did not detract from the credibility of R.D.'s account or enhance the credibility of Record's.

Record's reliance on the length of deliberations here as an indicator of prejudice is similarly unavailing. To be sure, the jury deliberations persisted for 18 hours over the course of four days, the jury asked a number of questions, and the jury requested readback of R.D.'s testimony. But the duration of the jury's deliberation could also be attributed to the jury's consideration of other issues—for example, the asportation element of count 1, or the difference between counts 2 and 3. None of the jury questions specifically targeted the issue of whether Record sexually penetrated R.D. or any aspect of the forensic analysis; rather, a number of the questions related to the jury's technical difficulties with DVD players and laptop speakers. We cannot conclude based solely on the length of the jury deliberations that the jury found the evidence of the sexual penetration to be a close issue.

For these reasons, it is not reasonably probable that in the absence of the assumed error, Record would have received a more favorable verdict. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

28

**D.** *Right to be Present at Critical Proceedings*

Record next argues that the trial court violated his constitutional right to be present at a critical stage of the proceedings when it discussed limitations on his testimony in chambers outside his presence. We conclude that Record has not demonstrated that his presence at the chambers conference would have contributed to the fairness of the proceeding.

**1.** *Background*

Before trial, the prosecutor moved in limine to admit evidence of Record's prior alleged sexual misconduct in Mexico. In response, defense counsel moved to exclude any reference to Record's prior arrests or convictions from Mexico.

In March 2019, Record was present during a hearing held on various in limine motions, where his prior criminal record was discussed. At the time, the prosecutor represented that Record had a prior conviction for rape in Mexico. Defense counsel argued that there was no record that Record had been convicted of a crime and that his information was that the result of a three-person appellate review in Mexico had led to Record's release. According to defense counsel, the Department of Justice (DOJ) had indicated that it would take several weeks to receive more information about Record's prior conviction. The prosecutor countered that Record *had* a conviction but that she was waiting to receive documentation about why the appellate court in Mexico later overturned the conviction. The prosecutor argued that a district attorney investigator in San Diego had provided a Spanish copy of Record's criminal history that showed that he had served time in prison for rape and weapons charges. The trial court preliminarily decided to preclude any mention of Record's prior conviction until further notice.

During trial, the prosecutor did not seek to introduce evidence of Record's prior convictions during his case-in-chief. However, when Record's sister, A.R., testified that Record was a compassionate, caring person raised as a Christian to help others, the trial

29

court and counsel had an unreported sidebar about Record's prior convictions, which the trial court later memorialized on the record in Record's presence.[7] On the record, the trial court stated that the prosecutor had asked to approach for permission to ask A.R. if she knew of the allegations that Record had raped two women at knifepoint in Mexico. The trial court, however, ruled that the evidence would not be admissible "unless and until we had all the information which the [DOJ]'s office was supposed to be working on and translating which so far has not come to fruition."

The prosecutor made a further record and stated that she had had received four certified DOJ reports but was still waiting on the certified conviction from the DOJ. The records, which were in Spanish, disclosed that there were four separate instances where Record was the subject of a sexual assault investigation: these included a criminal investigation in 2011 where his vehicle was linked to an alleged rape or sexual abuse and another sexual assault investigation in 2008 where a victim was pulled off the street, kidnapped, and raped. The prosecutor argued that if Record testified and "open[ed] the door" to the evidence by claiming that he would never hurt anyone, she should be permitted to examine him regarding his alleged prior acts.

Although defense counsel argued that the DOJ reports were inadmissible hearsay, counsel also stated, "[I]t is not my intention to have my client say he has not suffered a conviction or an arrest. I'm not going to ask him that question. He's already on tape before the jury where he said, I would not rape; I have not raped; I'm not that kind of guy."

The trial court stated that it had not been presented with the particular evidence of the sexual assault but also that it had not precluded the evidence pending the additional

_____

[7] It is unclear whether this unreported sidebar is the meeting in chambers that Record takes issue with. However, there is no dispute that the meeting in chambers at issue here took place before Record testified on behalf of his own defense.

paperwork. The trial court thereafter reiterated that the prosecutor should not mention the prior convictions, but she could request a sidebar if she believed that Record had opened the door to elicit the evidence by his testimony. Record made no comments on the record during the court and counsel's discussions of his prior convictions and subsequently proceeded to testify on behalf of his own defense.

In a first hearing on Record's posttrial *Marsden*[8] motion, defense counsel recalled a discussion in chambers outside Record's presence about the scope of his testimony and impeachment. Defense counsel represented that the trial court had indicated to counsel at the time that "it would not be fair and proper for Mr. Record to say, specifically 'I have no criminal record,' " when we knew there was something lingering from Mexico." Defense counsel later stated, "[Y]ou asked me to go advise him that he's not to say anything about a record in Mexico, which strategically I wouldn't have done anyway." The trial court clarified: "[T]he gist of it was that although the prosecution was unable to prove the prior, they had a good faith basis to ask the question if Mr. Record said he had no criminal activity in his past. She was positing that she would be allowed to say, 'Well, didn't you rape two women in Mexico?' We were attempting to not go down that road, one, because it couldn't be proved and a negative couldn't be proved."

At a further posttrial hearing, Record again argued that the trial court had violated his right to be present at critical stages of the trial when it held discussed his criminal history outside his presence. Record argued he should not have been excluded from a discussion about the scope of his testimony, as he was the person most knowledgeable about his own criminal record.

Finally, during the sentencing hearing approximately a week later, the trial court recounted that the prosecutor had represented that she had been trying to get the DOJ to

---

[8] *People v. Marsden* (1970) 2 Cal.3d 118.

authenticate certain records from Mexico.  The trial court, however, indicated that defense counsel had at the time represented that he had been provided a copy from Record's prior attorney of "a dismissal or something of that nature" related to the Mexico case.  Nonetheless, the trial court stated that had Record testified that he did not have any criminal record, the court would "most likely have allowed the DA to present evidence of those rapes."

Defense counsel confirmed that Record was indeed absent from a chambers conference where the trial court discussed with counsel the nature of his testimony. Following the discussion, defense counsel told Record that his examination was not going to "make any mention of anything in Mexico or that he was a law-abiding citizen because of the pending request by the People to get the [DOJ] to give them a complete file from Mexico."  Defense counsel stated:  "The documents that were produced back at the preliminary examination, of which the People had a copy of, was a translated Court acquittal out of Tijuana of those charges.  [The prosecutor] was not satisfied.  She wanted a more complete file."  Defense counsel also added:  "I made my decision strategically at trial perfectly clear.  I did not want to litigate any facts about what happened in Mexico in this Court.  So I did everything I could to avoid any mention of it."

### 2. *Legal Principles*

The Sixth Amendment of the United States Constitution and the California Constitution both guarantee a defendant the right to be present at critical stages of the criminal process.  (*Iowa v. Tovar* (2004) 541 U.S. 77, 80-81; Cal. Const. art. 1, § 15.)  A defendant's right to be present is also statutorily required under sections 977 and 1043. However, " ' "[n]either the state nor the federal Constitution, nor the statutory requirements of sections 977 and 1043, require the defendant's personal appearance at proceedings where his presence bears no reasonable, substantial relation to his

32

opportunity to defend the charges against him." ' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 799.)

"[A] defendant's right to be present depends on two conditions: (1) the proceeding is critical to the outcome of the case, and (2) the defendant's presence would contribute to the fairness of the proceeding." (*People v. Perry* (2006) 38 Cal.4th 302, 312 (*Perry*).) "Thus a defendant may ordinarily be excluded from conferences on questions of law, even if those questions are critical to the outcome of the case, because the defendant's presence would not contribute to the fairness of the proceeding. Examples include the exclusion of a defendant from a conference on the competency of child witnesses [citation], a conference on whether to remove a juror [citation], and a conference on jury instructions [citation.]." (*Ibid.*)

On appeal, we apply an independent or de novo standard of review to the trial court's exclusion of a defendant from trial or a part of trial. (*Perry*, *supra*, 38 Cal.4th at p. 311.) "Erroneous exclusion of the defendant is not structural error that is reversible per se, but trial error that is reversible only if the defendant proves prejudice." (*Id.* at p. 312.) We review a violation of a federal constitutional right for prejudice under *Chapman*, *supra*, 386 U.S. 18, and must determine whether a defendant's absence was harmless beyond a reasonable doubt. (*People v. Basler* (2022) 80 Cal.App.5th 46, 59.)

**3.    *Analysis***

Based on the record before us, even if we assume that the trial court's unreported conference was a critical stage of the proceedings, Record has not demonstrated that his presence would have contributed to the fairness of the proceedings. His argument to the contrary depends on an incorrect factual implication that his counsel was unaware of the disposition of Record's Mexican criminal proceedings, and an incorrect legal assumption that the Mexican adjudication entitled him to put his character at issue risk-free.

33

As a factual matter, defense counsel, well before the unreported chambers conference, was demonstrably aware that Record's criminal charges in Mexico did not ultimately result in a conviction. And neither on appeal nor in the trial court has Record identified what additional facts he might have provided about the disposition of his charges that were otherwise unknown to defense counsel. It was the prosecutor who remained unconvinced by the available records and sought further confirmation from the DOJ.

We note as well that defense counsel made clear that it was his tactical decision to not elicit testimony to the effect that Record had no prior criminal history, not because counsel doubted the favorable resolution of the charges in Mexico, but because counsel did not want to "litigate any facts about what happened in Mexico." Record may have wanted to testify that he had no criminal convictions or "no criminal record," but " ' "[w]hen a defendant chooses to be represented by professional counsel, that counsel is 'captain of the ship' and can make all but a few fundamental decisions for the defendant." ' " (*People v. Roldan* (2005) 35 Cal.4th 646, 682, disapproved of on a different point as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see *People v. M.H.* (2022) 81 Cal.App.5th 299, 307 ["fundamental rights include whether to plead guilty, to waive the right to trial by jury, to waive the right to counsel, and to waive the right to be free from self-incrimination"].)

Counsel's tactical decision to avoid litigating any facts about Record's criminal record appear to reflect counsel's recognition of the legal flaw in Record's insistence that the Mexican adjudication left him free to put his good character at issue without consequence. In the initial *Marsden* hearing, Record asserted that he "had the right to tell the jurors, 'Hey. I have no criminal record. I have no conviction. Take that into account.' This is relevant evidence of my credibility, my character and intent." Leaving aside whether the disposition of Record's arrests and prosecution constituted a "criminal

34

record" as distinct from a conviction, the absence of a conviction did not immunize him from impeachment as to his credibility and—had he put them at issue—as to his law-abiding, nonpredatory character. "A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352." (*People v. Clark* (2011) 52 Cal.4th 856, 931, fn. omitted.)[9] If Record had in fact testified as he wished to, the trial court would have had the discretion to permit the prosecution to cross-examine Record about the original allegations underlying the Mexican arrests and prosecutions, if satisfied the available records provided the prosecutor a basis to so inquire in good faith. (*People v. Pearson* (2013) 56 Cal.4th 393, 434 [requiring only "a good faith basis for asking the question"]; Evid. Code, §§ 773, subd. (a) [witness may be cross-examined "upon any matter within the scope of the direct examination"].) That Record would surely have denied any culpability would not necessarily have dispelled the concerns of experienced trial counsel as to the potential impact of such cross-examination on a jury that had already heard Record in his post-arrest interview protesting, "What? I never tried to do nothing like that. I'm not—I'm not that type of person; . . . [¶] I would never do something like that."

Furthermore, based on Record's statements during the *Marsden* hearing and at sentencing, the conference where he was excluded must have taken place sometime

_____

[9] Record notes that whether he had a prior criminal conviction was important to the jury, as during deliberations, the jury asked whether Record "has been convicted of any other crimes previously." Yet the jury's interest merely underscores why defense counsel could reasonably have considered it wiser to rely on Record's unimpeached prior denial of a relevant history and to avoid any testimony as to Record's criminal record. Despite the disposition of Record's sexual assault proceedings in Mexico, there remained the possibility that the trial court would agree with the prosecutor that she had a good-faith basis to question him in detail about alleged misconduct, either as impeachment or as evidence under Evidence Code section 1108.

before he testified on his own behalf because Record claims that following the conference, his attorney advised him not to testify that he had no criminal convictions. Yet right before Record testified, the subject of his criminal convictions was discussed at length by defense counsel, the prosecutor, and the trial court, and the reporter's transcript reflects that Record was present when the discussions took place. Record accordingly had the opportunity to interject when the prosecutor stated that she was still waiting on a certified conviction from Mexico from the DOJ, but he elected either to make no comment or to limit any response to his attorney. Nor did Record make any comments when the trial court stated that the prosecutor could request a sidebar if she believed that Record had opened the door to elicit testimony about his prior convictions during his testimony.

Thus, even assuming Record could have clarified that he had no prior convictions at the unreported conference, he had an equal opportunity to raise his concerns to defense counsel, the prosecutor, and the trial court during the subsequent proceeding where the same issues were raised in his presence.

Accordingly, we conclude that Record is unable to demonstrate that his presence at the unreported conference would have contributed to the fairness of the proceedings. (See *Perry*, *supra*, 38 Cal.4th at p. 312.) Moreover, for the same reasons—defense counsel already knew of Record's acquittal and further strategically chose not to make any mention of Record's criminal record, and Record had opportunities to raise his concerns at other proceedings—we conclude that his absence at the unreported conference is harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 23.)

## E. *Assembly Bill No. 518*

In a supplemental brief, Record argues that remand for resentencing is required under Assembly Bill No. 518, which recently amended section 654. We conclude that

36

remand for resentencing is not required because the trial court cannot stay sentences imposed under the One Strike law (§ 667.61).

Here, Record was sentence to 25 years to life for sexual penetration by force committed during a burglary under the One Strike law (§ 667.61, subds. (a), (d)). During the sentencing hearing, the trial court also stayed the sentences for kidnapping, which we have reversed, and burglary under section 654.

At the time Record was sentenced, section 654 provided that when an act or omission was "punishable in different ways by different provisions of law," the trial court was required to punish the defendant "under the provision that provides for the longest potential term of imprisonment." (Former § 654, subd. (a).) Effective January 1, 2022, section 654, subdivision (a) now "afford[s] sentencing courts the discretion to punish the act or omission under either provision," and the trial court is no longer required to impose the longest term of imprisonment. (*People v. Mani* (2022) 74 Cal.App.5th 343, 351 [as an ameliorative change in the law, amendments to section 654 apply retroactively to cases not yet final on appeal].) "When a defendant is convicted of two offenses for which section 654 prohibits multiple punishment (as is the case here), the trial court imposes sentence for one of them, and then imposes and stays the sentence for the other offense. [Citation.] A stay is a type of suspension." (*People v. Caparaz* (2022) 80 Cal.App.5th 669, 689 (*Caparaz*).)

Record's sentence of 25 years to life, however, is mandated by the One Strike law, which provides: "Notwithstanding any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, a person who is subject to punishment under this section." (§ 667.61, subd. (h).) Thus, under section 667.61, subdivision (h), a trial court is not permitted to stay a sentence that was imposed under the One Strike law. (*Caparaz*, *supra*, 80 Cal.App.5th at p. 689.) Rejecting the defendant's contention that section 667.61, subdivision (h) prohibited only a grant of

37

probation, the court in *Caparaz* reasoned, "this interpretation of section 667.61(h) renders the phrase 'nor shall the execution or imposition of sentence be suspended for' meaningless, and 'interpretations that render statutory terms meaningless as surplusage are to be avoided' [citation]." (*Ibid.*)

Record argues that the analysis in *Caparaz* is wrong because it relied on language in *People v. Santana* (1986) 182 Cal.App.2d 185 defining a "stay" as a "temporary suspension," without appreciating the *Santana* court's proviso that the trial court's "stay" of a five-year enhancement alleged under section 667, subdivision (a) in that case had the "functional effect" of striking the enhancement for all purposes. (*Id.* at pp. 190-191; see also *Caparaz*, *supra*, 80 Cal.App.5th at p. 689.) Even if we did not find the textual analysis of the statute in *Caparaz* to be dispositive, Record's focus on *Caparaz*'s treatment of *Santana* is unavailing. The trial court in *Santana* did not purport to act under section 654 in staying the five-year enhancement there; rather, the *Santana* court invoked former section 1385, which did not then permit a trial court to stay all or part of a sentence. (*Santana*, *supra*, at p. 192.) A sentence that is stayed under section 654 is *not* functionally equivalent to striking a sentence or enhancement *precisely* because it *can* be resurrected if the related offense is somehow reversed. (See *People v. Alford* (2010) 180 Cal.App.4th 1463, 1469.)

There is therefore no need to remand the matter for resentencing.

### III. DISPOSITION

The judgment is affirmed.

_____

LIE, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

GROVER, J.

*People v. Record*
H048100